IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANTHONY JOEL DUCK, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 3:26-cv-0747<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Anthony Joel Duck, Jr. filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I AFFIRM the Commissioner's decision.

**Procedural background**

In February 2024, Duck applied for disability insurance benefits and supplemental security income.[1] Tr. 296, 303. In his applications, Duck alleged

---

[1] Duck completed his disability insurance benefit application in January 2024, Tr. 296, but the Social Security Administration received it in February 2024, Tr. 298; *see* C.F.R. 20 § 404.614 (defining the filing date as "the day [an application] is received by an SSA employee").

a disability onset date of February 18, 2021,[2] claiming that he was disabled and limited in his ability to work due to dissociative identity disorder, anxiety, paranoia, severe depression, probable autism, attention deficit hyperactivity disorder (ADHD), memory loss, cluster headaches, post-traumatic stress disorder (PTSD), and bipolar. Tr. 328. After the Commissioner denied Duck's applications initially, Tr. 174–77, 179–83, and on reconsideration, Tr. 193–95, 205–06, Duck requested a hearing before an administrative law judge (ALJ), Tr. 208.

In May 2025, Duck appeared and testified at a telephonic hearing before an ALJ. Tr. 39, 40–54. Duck was represented by counsel. Tr. 39, 209. A qualified vocational expert, Brett Salkin, also testified. Tr. 54–63. Later that month, the ALJ issued a written decision finding that Duck was not disabled and therefore not entitled to benefits. *See* Tr. 17–31. The Appeals Council declined further review, making the ALJ's decision final. Tr. 1; *see* 20 C.F.R. § 404.981.

Duck timely filed this action in January 2026. Doc. 1. In his opening brief, Duck assigns the following errors for review:

> 1. The ALJ failed to properly evaluate Mr. Duck's impairments under medical listings (12.03 and 12.04) and, as a result, the decision is not supported by the facts, the law, or substantive evidence.

---

[2] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2. The ALJ's residual functional capacity determination is not supported by substantial evidence.[3]

Doc. 8, at 5, 12.

**Evidence**[4]

*Personal and Vocational Evidence*

Duck, who was born in 1989, had just turned 32 years old on his alleged disability onset date. Tr. 121. He graduated from high school, Tr. 41, 329, and received "some" college-level education, Tr. 966. Before the disability onset date, Duck worked as a call center operator, fast food cook, customer service representative, and restaurant manager, but none of these jobs lasted for more than a few months. Tr. 330. Since February 2021, he has had no relevant work experience. Tr. 55.

*Medical Evidence*

In November 2021, Duck sought a behavioral health consultation with Philip Behnfeldt, a nurse practitioner, for anxiety and depression. Tr. 480. At the time, Duck already had a "multi-year history of anxiety and depression"

---

[3] A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[4] The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

and was taking buspirone and lamotrigine. Tr. 480. His reported symptoms included a depressed mood, tearfulness, hopelessness, worthlessness, insomnia, fatigue, and excessive worry. Tr. 480. Duck, however, denied hallucinations, Tr. 480, and his thought contents were overall normal, Tr. 481. He was also alert and cooperative. Tr. 481. After the exam, Behnfeldt diagnosed Duck with major depressive disorder and psychological trauma history, Tr. 483, prescribing sertraline, prazosin, and hydroxyzine, Tr. 483–84. When Duck followed up in January 2022, he was compliant with his medications and reported that the medications "ha[d] been working." Tr. 464. He denied hallucinations, suicidal or homicidal thoughts, or side effects from his medications. Tr. 464. His sleep had also improved. Tr. 464.

In September 2022, Duck attended a virtual psychotherapy session with Lora Meyers, a licensed social worker. Tr. 665. Duck arrived on time, was appropriately dressed, and displayed a euthymic mood with a congruent affect.[5] Tr. 665, 667. During his earlier sessions with Meyers, Duck had exhibited symptoms of dissociative identity disorder. Tr. 665. At this session, Duck detailed "an extensive history of trauma in relationships, including his parents['] divorce, neglect, abuse[,] and sexual assault." Tr. 665. He also reported stress-related paranoia, a feeling of abandonment, and history of suicidal ideation, but denied any present suicidal or homicidal ideations. Tr.

---

[5] A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

665. Meyers diagnosed Duck with dissociative identity disorder, noting that he also met "the criteria of PTSD and Borderline Personality Disorder." Tr. 666.

Duck remained in therapy with Meyers, initially meeting weekly. Tr. 662, 810. By March 2024, Duck showed improvements in his self-worth, yet the intensity of his distress remained unchanged. Tr. 662. That same month, Duck submitted a function report to the Social Security Administration. Tr. 338–44. In the report, Duck stated that it was "to[o] scary" for him to leave his house, Tr. 342, and that he could not pay bills or use a checkbook, Tr. 341. He also could not maintain his attention for longer than five minutes. Tr. 343. Duck also said that he was "poor[]" in dealing with changes in routine and in following spoken instructions, "very poor[]" in handling stress, and yet was "decent[]" in following written instructions. Tr. 343–44. Regarding his social activities, Duck said that he "just chat" with others "daily" via texts and video calls. Tr. 342. He could also handle a savings account, count change, shop for food online, and cook simple meals. Tr. 340, 341.

Beginning April 2024, Duck and Meyers shifted their sessions to a bi-weekly schedule, but Duck missed five appointments through September 2024. Tr. 810. Meanwhile, in May 2024, Duck underwent a dissociative experiences scale II (DES-II) test. *See* Tr. 898–900. While "scores of 30% or greater correlate with high levels of dissociation," he scored 79%. Tr. 898.

In July 2024, Duck saw Michelle Bassiouni, a certified physician assistant, for a consultative psychiatric examination.[6] Tr. 673–78. During the exam, Duck was alert, oriented, calm, and relaxed, exhibiting no excessive movement. Tr. 675. He spoke in a fluent manner and maintained regular eye contact. Tr. 675. He also presented a euthymic mood and a congruent affect, as well as good attention and concentration. Tr. 677. Duck, however, reported that he "ha[d] auditory and visual hallucinations" and felt "helpless and hopeless." Tr. 673. Although Duck denied suicidal or homicidal ideation, Tr. 675, he acknowledged having some "fleeting thoughts of suicide," Tr. 673. Duck claimed that he suffered "dissociative identity disorder, anxiety, paranoia, severe depression, probable autism, ADHD, memory loss, PTSD, and bipolar disorder," but Bassiouni observed that Meyers had diagnosed Duck solely with dissociative identity disorder, and that all other conditions were merely self-reported. Tr. 677.

Bassiouni also found Duck to be "malingering" and "manipulative," pointing to his overt efforts "to control and direct" the examination. Tr. 677. For example, Duck told Bassiouni, "notice how long it takes me to answer

---

[6] When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether—and how much—the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

questions," despite answering promptly within three to five seconds. Tr. 677. Duck also claimed, "if I seem more calm it's because I am switching to a different personality at this time." Tr. 677. Still, although Bassiouni felt that "a lot of [Duck's] claims seem[ed] to be quite vague," she credited that Duck suffered auditory and visual hallucinations. Tr. 677. Because hallucinations were not common symptoms of dissociative identity disorder, Bassiouni suggested changing Duck's diagnosis to schizoaffective bipolar disorder. Tr. 677.

After assessing Duck's mental RFC, Bassiouni determined that Duck could follow simple and complex instructions, sustain attention in a competitive work environment, and get along with supervisors, co-workers, and the public. Tr. 678. Bassiouni added that Duck had only "slight difficulty tolerating stress associated with work activity" and was managing his mental health with a medication regimen. Tr. 678. State agency psychologists, both initially and on reconsideration, agreed with Bassiouni's opinion. Tr. 137–38, 155–56. They concluded that Duck had moderate limitations in adapting or managing himself. Tr. 137, 155. They also concluded that Duck had mild mental limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace. Tr. 137, 155.

As for Duck's physical RFC, state agency physicians determined that Duck could occasionally lift or carry 50 pounds and frequently lift or carry 25

pounds,[7] with no pushing or pulling limitations in either his upper or lower extremities. Tr. 139, 148. They also found that Duck could sit, stand, or walk for up to six hours during a workday, and that he was capable of frequently crawling, crouching, kneeling, stooping, balancing, and climbing ramps and stairs, as well as occasionally climbing ladders, ropes, and scaffolds. Tr. 139, 148. The physicians, however, noted that Duck must "avoid more than occasional, concentrated exposure to hazards such as dangerous moving machinery [and] unprotected heights." Tr. 139, 148.

In September 2024, the therapy sessions with Meyers returned to a weekly schedule after Duck reported an increase in his symptoms, which "interfer[ed] with his ability to maintain daily living skills." Tr. 810. These symptoms decreased by the next month, although Meyers noted that Duck "ha[d] been isolated in his home" and reported being "disconnected from his emotions." Tr. 810. Duck's DES-II score also went down to 63% in October 2024. Tr. 928.

---

[7] "'Frequently' is a term of art in the disability context" and means "activity that is performed … from as little as 1/3 of the time up to (but not exceeding) 2/3 of the workday." *See Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *8 (N.D. Ohio June 11, 2018) (citing the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C,* U.S. Dept. of Labor (1993) and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 (SSA Jan. 1, 1983)), *report and recommendation adopted,* 2018 WL 3126552 (N.D. Ohio June 26, 2018). "Occasionally" means performing an activity for "up to 1/3 of the time." *See Selected Characteristics*, *supra*, and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5.

In January 2025, Duck visited a physician, complaining of "intermittent knee pain" that had lasted for months. Tr. 823. The doctor noted that Duck "use[d] a cane for mobility support." Tr. 823. Later that month, Duck returned and reported that his depression was "getting worse." Tr. 819–20. Duck said that he could not get up, perform his daily routine, or take shower. Tr. 820. He also had no "interest in day-to-day activities" and had decreased sleep, though his appetite remained the same. Tr. 820. Even so, Duck denied hallucinations or suicidal thoughts, Tr. 820, 821, and his provider found Duck "well-developed and well-nourished" with no signs of distress. Tr. 820. The provider discovered that while Duck had been prescribed a medication regimen of Zoloft, Abilify, Trazodone, and Hydroxyzine, he had stopped taking Abilify and Hydroxyzine. Tr. 820. In February, Duck's DES-II score rose slightly to 67%. Tr. 958. Duck also scored 24 on Patient Health Questionnaire-9 (PHQ-9),[8] Tr. 961, and 17 on the Generalized Anxiety Disorder-7 (GAD-7) test,[9] Tr. 963.

---

[8] "The PHQ-9 is the depression module of the Patient Health Questionnaire (PHQ), which is a self-administered diagnostic instrument for common mental disorders." *Seals v. Comm'r of Soc. Sec.*, No. 1:18-cv-1345, 2019 WL 4141499, *2 n.2 (N.D. Ohio Aug. 30, 2019) (internal citation and quotation marks omitted). The module scores each of nine criteria on the scale of "0 (not at all) to 3 (nearly every day)." *Id.*

[9] "The GAD-7 is a screening test to determine if a patient has generalized anxiety disorder." *Cody H. v. Bisignano*, No. 24-cv-03056, 2025 WL 1788474, at *2 n.5 (D. Minn. June 11, 2025), *report and recommendation adopted*, 2025 WL 1787562 (D. Minn. June 27, 2025). Scores greater than 15 indicate severe anxiety. *Id.*

Duck restarted Abilify and Hydroxyzine. Tr. 821. When he revisited Meyers in March 2025, Duck appeared alert, oriented, and appropriately dressed. Tr. 969. He also demonstrated fair insight, good attention, and appropriate thought contents. Tr. 969. Duck "denie[d] all areas of risk," and Meyers found no clinical indications to the contrary. Tr. 969. Duck, however, reported that he was "sleeping 10-13 hours per day" and had not left his home for a week. Tr. 969. After reviewing Duck's symptoms and test scores, Meyers diagnosed Duck with dissociative identity disorder and schizoaffective disorder. Tr. 976, 977.

*Hearing Testimony*

Duck, who was represented by counsel, appeared and testified by phone at the May 2025 administrative hearing. Tr. 39. Duck was 5' 8" tall and weighed around 294 pounds. Tr. 40–41. He had knee and back pains, and used a cane for support "whenever he ha[d] to go walking." Tr. 51. He did not interact with his family members, Tr. 47, but lived with his partner, Tr. 40, whom Duck said that he felt "safe" being around, Tr. 47. Duck denied having any physical difficulties caring for himself, but as to his mental condition, he reported occasional lack of motivation in dressing himself or getting a shower. Tr. 52. Duck washed dishes "every now and then," and tried to help with household chores, but acknowledged that "it's not much." Tr. 53. As to hobbies, he denied doing anything "real physical." Tr. 53. Duck instead played video games, read, and wrote occasionally, but reported difficulty concentrating when engaging in these activities. Tr. 53. He had also attempted to work via

temp agencies, but he quit those jobs because he "had a lot of stress and was dealing with a lot." Tr. 53. Duck added that when he worked at Macy's, he felt "stabbing" pains in his legs and foot. Tr. 54.

Duck stated that his "dissociation and schizoaffective thing[s]," which caused visual and auditory hallucinations, kept him from working full-time. Tr. 41. On a daily basis, he heard "some voice talking in [his] head" and saw "something that's not there." Tr. 42–43. He also reported having 30 personalities in his head, which created "30 inner narratives going on at one time, 30 different trains of thoughts, different personalities, [and] different viewpoints." Tr. 44. Duck added that these personalities could "shift at any time." Tr. 44.

Duck also cited his depression and anxiety as the reasons that he could not work. *See* Tr. 41–43. Duck testified that he could not do anything when he felt depressed. Tr. 43. His depression sometimes lasted for "several weeks" until it slightly improved and then worsened again. Tr. 43. Likewise, Duck stated that his anxiety caused "the stress of just having a job in general" and exacerbated his mental health issues. Tr. 41. To cope with the anxiety, Duck avoided leaving his residence and stayed "normally within [his] own apartment." Tr. 45. Duck explained that he could not even walk one city block without having a panic attack. Tr. 42. He described an incident where he suffered a panic attack after seeing "so many people" inside a store. Tr. 45. Duck was unsure about his ability to stand, but he estimated that he could

stand for 30 minutes at a time. Tr. 42. Although Duck said that medications had taken "the edge off [his] depression," his other mental health issues, such as paranoia and anxiety, persisted. Tr. 45.

Qualified vocational expert Brett Salkin also testified. Tr. 54–63. Salkin testified that at the medium exertional level, a hypothetical individual with Duck's age, education, and mental and physical limitations could work as a janitor and cleaner, landscaping and groundskeeping worker, and dishwasher. Tr. 55–56. Salkin added that at the light exertional level,[10] the same individual could still work as a janitor and cleaner, as well as a dishwasher, while also being able to work as a packer and packager. Tr. 56. Next, the ALJ asked whether the same individual could maintain employment if he were limited to sitting or standing "for one or two minutes in the immediate vicinity of the workstation no more frequently than every 30 minute," while staying on task for at least 90 percent of the workday. Tr. 57. Salkin answered that the person could work as an office clerk, bookkeeping and accounting clerk, and production and expediting clerk. Tr. 57. Salkin stated that the individual could work in these same positions even if he were limited to the sedentary

---

[10] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); *see Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010). Additionally, "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg control." 20 C.F.R. § 404.1567(b).

exertional level and required a cane for ambulation.[11] Tr. 58. Salkin, however, acknowledged that if the individual had to work in isolation, he would not be able to find a job. Tr. 62–63. Finally, Salkin observed that an individual who was consistently off-task more than 10 percent of the workday or missed one day of work per month would be unable to find competitive employment. Tr. 59–60, 62.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2023.
>
> 2. The claimant has not engaged in substantial gainful activity since February 18, 2021, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 3. The claimant has the following severe impairments: Dissociative Identity Disorder; major depressive disorder / Bipolar disorder; Post-traumatic stress disorder ("PTSD"); Attention deficit hyperactivity disorder ("ADHD"); Obesity; and general anxiety disorder / unspecified anxiety / paranoia (20 CFR 404.1520(c) and 416.920(c)).

---

[11] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); *see Wages v. Sec'y of Health & Hum. Servs.*, 755 F.2d 495, 498 (6th Cir. 1985).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: Postural limitations of occasional climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Frequent stooping, kneeling, crouching, and crawling. Environmental limitations to avoid all exposure to moving mechanical parts and high exposed places. Can understand, remember and carry out simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgement to make simple work related decisions, with infrequent changes explained in advance. Occasional interaction with the general public.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant … was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

> 8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).
>
> 9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from February 18, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 21–30.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ must follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. Substantial evidence supports the ALJ's step-three determination.*

In his first assignment of error, Duck contends that substantial evidence does not support the ALJ's step-three analysis. Doc. 8, at 5, 9. At step three of the sequential evaluation, a claimant will be found disabled if his impairment meets or equals one of the impairments listed by the Social Security Administration. 20 C.F.R. § 404.1520(a)(4)(iii). The listing of impairments, which is located at Appendix 1 to Subpart P of part 404 of Title 20 of the Code of Federal Regulations, describes impairments that the Social Security Administration "consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Each listing also details "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). To "meet" the requirements of a listed impairment, a claimant must satisfy "all of the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).

Yet "a claimant is also disabled if [the claimant's] impairment is the *medical equivalent* of a listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citation omitted). Medical equivalence means "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). When determining whether a claimant's

condition is equivalent in severity to a listing, an ALJ must "compare the medical evidence with the requirements for [the] listed impairment[]." *Reynolds*, 424 F. App'x at 415. That said, the ALJ is not required to "articulate, at length, the analysis of the medical equivalency issue." *Bledsoe*, 165 F. App'x at 411 (citing 20 C.F.R. § 404.1526). Rather, "[w]hen a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

In this case, Duck claims that the ALJ "improperly evaluated … Duck'[s] impairments as they relate to Listings 12.03 and 12.04." Doc. 8, at 5. Listing 12.03 concerns "schizophrenia spectrum and other psychotic disorders," and Listing 12.04 pertains to "depressive, bipolar[,] and related disorders." 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.03, 12.04. The severity requirements for these listings are set out in paragraphs A, B, and C. § 12.00(A)(2). To meet either listing, Duck must satisfy the requirements of paragraphs A and B or paragraphs A and C. *See* § 12.00(A)(2); *Scott v. Kijakazi*, No. 4:22-cv-878, 2023 WL 4010687, at *7 (N.D. Ohio June 15, 2023). For paragraph A of Listing 12.03, Duck must provide medical documentation of one or more of the following: delusions or hallucinations, disorganized thinking (speech), or grossly disorganized behavior or catatonia. § 12.03(A). For Listing 12.04,

paragraph A requires Duck to provide medical documentation of depressive or bipolar disorder. § 12.04(A).

Next, under paragraph B, the ALJ must rate the degree of limitations across the following four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. § 12.00(E)(1)–(4); *Schandel v. Comm'r of Soc. Sec.*, No. 5:25-cv-00921, 2026 WL 539125, at *7 (N.D. Ohio Feb. 26, 2026), *report and recommendation adopted*, 2026 WL 928210 (N.D. Ohio Apr. 6, 2026). The degree of limitation is rated on a five-point scale: none, mild, moderate, marked, and extreme. § 12.00(F)(2). To satisfy the paragraph B criteria, Duck must show either one "extreme" limitation or two "marked" limitations. § 12.00(F)(2).

Finally, for paragraph C, Listings 12.03 and 12.04 require Duck to show that his mental condition was "serious and persistent," with a medically documented history over two years, and present evidence that his condition met subparagraphs C1 and C2. § 12.00(G). Subparagraph C1 is satisfied when evidence shows that Duck relied, on an ongoing basis, on medical treatment, mental health therapy, psychosocial support, or a highly structured setting, to diminish the symptoms and signs of his mental disorder. *See* § 12.00(G)(2)(b). Subparagraph C2 is satisfied when the evidence shows that Duck achieved only "marginal adjustment," which means the "minimal capacity to adapt to

changes in [his] environment and demands that are not already part of [his] daily life." § 12.00(G)(2)(c).

In challenging the ALJ's step-three analysis, Duck argues that "the ALJ never evaluated Listing 12.03 … at all" and instead "confined his analysis to Listings 12.04, 12.06, 12.08, and 12.15." Doc. 8, at 10. To be clear, aside from a brief observation that "the record is devoid of evidence to establish … a schizoaffective disorder," Tr. 21, the ALJ made no mention of Listing 12.03 in his written decision, Tr. 22–24. But "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x. 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x. 639, 641 (6th Cir. 2013)). Here, even though the ALJ did not expressly discuss Listing 12.03, he considered whether Duck's impairment satisfied paragraphs B and C under Listings 12.04. Because Listings 12.03 and 12.04 share the same paragraphs B and C, a failure to satisfy these criteria under Listing 12.04 would also preclude a finding of disability under Listing 12.03. *See Brown v. Saul*, No. 1:18-cv-1463, 2019 WL 4039055, at *8 (N.D. Ohio Aug. 27, 2019) (concluding that the ALJ's failure to discuss Listing 12.03 "would be harmless because the ALJ discussed listings 12.04 and 12.06"); *Abrams v. Saul*, No. 4:20-cv-00097, 2021 WL 2809434, at *7 (W.D. Ky. July 6, 2021) (affirming the ALJ's step-three analysis even though "the ALJ did not directly mention[] Listing 12.03" and only discussed Listing 12.04). In other words, the

dispositive question here is whether there was substantial evidence supports the determination that Duck satisfied neither paragraphs B nor C for Listing 12.04.

*Paragraph B*

In concluding that Duck failed to satisfy the paragraph B criteria, Tr. 24, the ALJ explained:

> The first functional area is the ability to understand, remember, or apply information. In this area, the claimant has mild limitations. Understanding, remembering, or applying information refers to the abilities to learn, recall, and use information to perform work activities, such as understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions. In an Adult Function Report, the claimant noted that he is able to go out alone, count change, and handle a savings account, but he cannot pay bills, or use a checkbook, he can follow written instructions "decently," and he can follow spoken instructions "poorly." (Exhibit B3E at 4-6). Therefore, the evidence supports a finding that the claimant has mild limitations in the ability to understand, remember, or apply information due to his mental impairments.
>
> The next functional area is interacting with others. In this area, the claimant has moderate limitations. This area refers to an individual's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. It includes the ability to get along with others, such as supervisors, co-workers, the public, family members, friends, neighbors, grocery clerks, landlords, or bus

drivers. In an Adult Function Report, the claimant noted that he spends time with others, he needs to be reminded to go places, he needs someone to accompany him when he goes out, and he has problems getting along with friends, family and neighbors, "because he finds it too scary to leave the house." (Exhibit B3E at 5). Therefore, the evidence supports a finding that the claimant has moderate limitations in interacting with others due to his mental impairments.

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has moderate limitations. Concentration, persistence, or pace refers to the abilities to focus attention on work activities and stay on task at a sustained rate sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In an Adult Function Report, the claimant noted that he can pay attention "maybe 5 minutes," he usually finishes what he starts, and he handles changes in routine "poorly," but handles stress "very poorly." (Exhibit B3E at 6-7). Therefore, the evidence supports a finding that the claimant has moderate limitations in concentration, persistence, or pace due to his mental impairments.

The fourth functional area is the ability to adapt or manage oneself. In this area the claimant has a moderate restriction. The ability to adapt or manage oneself refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. This includes adaptive activities such as responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

> In an Adult Function Report, the claimant noted that he has some problems with his personal care. He noted that he is able to dress himself, bathe, care for his hair, shave, feed himself, and use the toilet without much difficulty. However, the claimant noted that he needs reminders to take care of his personal needs, but not to take his medications. (Exhibit B3E at 2-3). Therefore, the evidence supports a finding that the claimant has moderate limitations in the ability to adapt or manage oneself due to his mental impairments.

Tr. 22–24.

Duck disagrees with this explanation, maintaining that substantial evidence supported a finding of "marked limitations in at least two domains: interacting with others and adapting or managing oneself." Doc. 8, at 8. First, as to his ability to interact with others, Duck cites Meyers's notes that he "ha[d] been isolated in his home" in October 2024, Doc. 8, at 8 (quoting Tr. 810), and that "[b]y March 2025, he reported not leaving the house all week," Doc. 8, at 8 (citing Tr. 969). He also highlights portions of his hearing testimony and function report to show that there was "near-total absence of independent, appropriate, effective, and sustained interaction," far exceeding moderate limitations found by the ALJ. Doc. 8, at 8 (citing Tr. 41, 46–47, 340). Similarly, regarding his ability to adapt or manage himself, Duck points to his own statement in January 2025 that he could not "get up and do his daily routine" and was "not motivated to take [a] shower." Doc. 8, at 9. Finally, Duck adds that he had more than moderate limitations in concentrating, persisting and maintaining pace, noting that his own reports and high scores on DES-II

indicate "a high level of dissociation" and, by extension, his inability to "stay on task at a sustained rate." Doc. 8, at 9.

Duck's argument, however, is misdirected. "The question before this Court is not whether substantial evidence supported marked limitations, but rather whether the ALJ *lacked* substantial evidence to support his contrary finding." *Ratliff v. Comm'r of Soc. Sec. Admin.*, No. 1:23-cv-00002, 2024 WL 4476110, at *20 (N.D. Ohio Oct. 11, 2024). Even if there were substantial evidence in the record that supports a finding of marked limitations, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[s] the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). In this case, although Duck highlights certain reports, testimony, and medical records that could support a finding of marked limitations, he "does not specifically identify what, if any, evidence the ALJ mischaracterized or failed to consider in reaching his own contrary conclusion." *Ratliff*, 2024 WL 4476110, at *20. To the extent that Duck invites this Court to reweigh the evidence and reassess whether he satisfied paragraph B, the Court must decline that invitation. *See Robbins v. Comm'r of Soc. Sec.*, No. 1:22-cv-2049, 2023 WL 8769603, at *12 (N.D. Ohio Oct. 20, 2023) (holding that such an argument "constitute[s] an impermissible request for the Court to reweigh the medical evidence and conclude itself whether [Robbins] satisfies the Paragraph B criteria"), *report and recommendation adopted*, 2024

WL 78276 (N.D. Ohio Jan. 8, 2024), *aff'd*, No. 24-3201, 2024 WL 4603964 (6th Cir. Oct. 29, 2024).

Duck also claims that the ALJ "cherry-picked" the record by exclusively relying on Duck's functional report for his paragraph B analysis, Doc. 8, at 16–17, but this argument fares no better. As courts have recognized, "cherry-picking" arguments are "seldom successful." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014); *Phillips v. Berryhill*, No. 3:16-cv-0193, 2017 WL 6045451, *at 5 (W.D. Ky. Dec. 6, 2017); *Smith v. Comm'r of Soc. Sec.* No. 1:14-cv-0984, 2015 WL 7460080, at *3 (W.D. Mich. Nov. 24, 2015). An ALJ improperly "cherry-picks" the record when he simply ignores "evidence that potentially supports a finding of disability," *Von Boeselager v. Comm'r of Soc. Sec. Admin.*, No. 1:25-cv-01018, 2026 WL 959224, at *10 (N.D. Ohio Apr. 9, 2026), but the ALJ need not "spell[] out every consideration that went into the step[-]three determination," *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."). Rather, the Court may look elsewhere in the ALJ's decision to support the step-three determination. *Immke v. Saul*, No. 1:18-cv-2218, 2020 WL 1940849, at *6 (N.D. Ohio Apr. 22, 2020); *see Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (holding that an ALJ did not err by failing to make specific step-three findings, where the ALJ's conclusion was supported by substantial evidence in the record). This is because "a duty

to 'consider' the evidence is different than a duty to 'discuss' the evidence." *Swain v. Comm'r of Soc. Sec. Admin.*, Case No. 1:24-cv-2224, 2025 WL 2322785, at *7 (N.D. Ohio Aug. 12, 2025).

Here, substantial evidence supports the conclusion that Duck had only mild to moderate impairments in the paragraph B areas of functioning. As for his ability to interact with others, Duck acknowledged in his function report that he could "decently" follow written instructions, get along with authority figures, and chat "daily" with others via texts and video calls. *See* Tr. 342, 343. Meyers, who had conducted counseling sessions with Duck for years, consistently observed that Duck behaved and communicated in an "appropriate" and "normal" manner during their sessions. *See* Tr. 665 (report from September 2022); Tr. 892 (report from May 2024). Bassioumi similarly found Duck to be "cooperative and pleasant" during Duck's consultative psychiatric examination. Tr. 675.

Next, although Duck claims marked limitations in his ability to adapt or manage himself, Doc. 8, at 9, he fails to demonstrate that the ALJ's finding of moderate limitations was "so lacking in evidence that a reasonable person could not 'accept [it] as adequate to support a conclusion.'" *Robbins*, 2023 WL 8769603, at *12 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). The record shows that Duck consistently appeared in appropriate attire for his appointments. *See* Tr. 665, 969; see also § 12.00(E)(4) (explaining that the ability to adapt to manage oneself involves "maintaining personal

hygiene and attire appropriate to a work setting”). Duck could handle a savings account, shop for food online, cook simple meals, and help with some household chores. *See* Tr. 53, 340, 341. He could also bathe and eat with reminders. *Kirchbaum v. Comm’r of Soc. Sec.*, No. 1:24-cv-00381, 2024 WL 3992276, at *7 (N.D. Ohio Aug. 29, 2024) (affirming an ALJ’s moderate limitation finding, where the claimant “was able to perform self-care with reminders” and had “appropriate grooming”).

Finally, turning to his ability to concentrate, persist, and maintain pace, Duck asserts that he could not “stay on task at a sustained rate.” Doc. 8, at 9. But, contrary to this claim, he displayed “good attention and concentration” throughout the consultative psychiatric exam by Bassiouni. Tr. 677. And following the exam, Bassiouni specifically opined that Duck “should be able to sustain attention in a competitive work environment.” Tr. 675. In the written decision, the ALJ explained that Bassiouni’s opinion was “somewhat persuasive,” observing that the opinion was “generally consistent with the medical record as a whole” and was “supported by the findings documented” in other treatment notes. Tr. 27; *see Gray v. Comm’r of Soc. Sec.*, No. 1:21-cv-0881, 2022 WL 17361659, at *5 (N.D. Ohio Dec. 1, 2022) (upholding the ALJ’s step-three findings when they “were consistent with the state agency psychological consultants”).

In sum, the ALJ properly conducted the requisite analysis as to the degree of limitation on Duck’s mental functioning and articulated his

reasoning. The ALJ did not apply the wrong legal standard or make factual findings unsupported by substantial evidence. The ALJ did not err. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("This Court must affirm the [ALJ's] conclusions absent a determination that the [ALJ] has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.").

*Paragraph C*

As for the paragraph C criteria, the ALJ explained:

> To satisfy the paragraph C criteria, a mental disorder must be "serious and persistent;" that is, there must be a medically documented history of the existence of the disorder over a period of at least two years, and evidence that satisfies the criteria in both C1 and C2 (see 12.00G). The claimant's impairments failed to meet the "paragraph C1 and C2" criteria, because the record, consistent with the findings below, does not demonstrate a mental disorder that is "serious and persistent," medically documented with a history of the existence of the mental disorder in the listing category over a period of at least two years, with evidence that shows: the claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of the mental disorder; or despite the diminished symptoms and signs, the claimant has achieved only marginal adjustment.

Tr. 24.

Duck argues that this explanation warrants reversal because "the ALJ failed to include any analysis or evidence to support [his] determination." Doc. 8, at 10. This argument is unavailing, however, because the ALJ's decision as a whole provides ample support for the conclusion that Duck failed to satisfy

the paragraph C criteria. *See Gray*, 2022 WL 17361659, at *5 ("Where the ALJ's decision as a whole articulates the basis for his conclusion, the decision may be affirmed"); *Ford v. Saul*, No. 3:19-cv-00931, 2021 WL 1603817, at *7 (W.D. Ky. Jan. 7, 2021) (affirming a "cursory" step-three analysis, where the ALJ "outlined evidence elsewhere in his opinion" showing that the claimant failed to meet paragraph C), *report and recommendation adopted*, 2021 WL 1224916 (W.D. Ky. Mar. 31, 2021).

For one, Duck's medical history and functional report constitute substantial evidence that Duck possessed more than a "minimal capacity to adapt to changes in [his] environment and demands that are not already part of [his] daily life." § 12.00(G)(2)(c) (defining "marginal adjustment"); *see James S. v. Comm'r of Soc. Sec.*, No. 1:25-cv-637, 2026 WL 2349430, at *4 (S.D. Ohio Aug. 13, 2026) (considering a claimant's treatment history and daily activities in finding substantial evidence supporting the ALJ's paragraph C finding). Although Duck attended outpatient therapy sessions for years, there is no evidence that he needed inpatient or emergency psychiatric care. *See* Tr. 674 (noting that Duck had no psychiatric hospitalizations in the past). In his function report, Duck acknowledged that he could care for himself with reminders, prepare simple meals, shop online, do some household chores, handle a bank account, and chat with people online. Tr. 340–42. He also attended medical appointments and counseling sessions, often displaying a normal mood, unremarkable thought contents, intact judgment, and good

concentration. *See* Tr. 102–04 (summarizing Duck's medical history). Overall, the evidence shows that Duck could "function outside of [his] home or a more restrictive setting, without substantial psychosocial supports." § 12.00(G)(2)(c); *see James S.*, 2026 WL 2349430, at *4 (finding that a claimant failed to satisfy paragraph C where he "had not required inpatient or emergent psychiatric care, could assist his mother with chores, maintain personal needs with reminders, shop online, and drive himself to monthly appointments"); *see also Colin U. v. Comm'r of Soc. Sec.*, 628 F. Supp. 3d 466, 471 (W.D.N.Y. 2022) (listing Second Circuit cases where a claimant failed to show marginal adjustment).

The ALJ's paragraph B analysis, which is discussed above, also supports the conclusion that Duck failed to satisfy the paragraph C criteria. When evaluating the paragraph B criteria, the ALJ concluded that Duck only had "moderate" limitations in adapting or managing himself. Under the regulations, a "moderate" limitation means that a claimant's ability to function "independently, appropriately, effectively, and on a sustained basis is *fair*." § 12.00(F)(2)(c) (emphasis added). In contrast, to establish "marginal adjustment," the claimant must possess no more than a "*minimal capacity to adapt* to changes in [his] environment or to demands that are not already part of [his] daily life." § 12.00(G)(2)(c) (emphasis added). Because the ALJ found that Duck retained a "fair" ability to adapt and manage himself, it necessarily follows that he had more than a "minimal capacity" to do so. As a result, the

ALJ's determination that Duck had a moderate limitation in adapting or managing himself precludes the finding of marginal adjustment.

Duck insists that he had "achieved only marginal adjustment," noting that his distress level remained high even after 18 months of weekly therapy sessions. Doc. 8, at 7. He also emphasizes that his depression symptoms worsened when Meyers reduced their therapy sessions from every week to every other week. Doc. 8, at 7. But even if Duck were correct that substantial evidence supports the finding of marginal adjustment, he must show that substantial evidence does *not* exist to support the ALJ's contrary finding. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key*, 109 F.3d at 273). Because Duck did not do so here, his argument falls short.

*2. The ALJ Did Not Err in Formulating the RFC.*

Duck's second assignment of error concerns the physical and mental limitations in the ALJ's RFC. *See* Doc. 8, at 12–13.

To begin, Duck challenges the ALJ's evaluation of his subjective symptoms, claiming that the ALJ erred by "[e]ntirely" relying on work history that predated Duck's alleged onset of disability. *See* Doc. 8, at 13–14. Social Security Ruling (SSR) 16-3p governs the ALJ's assessment of symptoms, which

was formerly referred to as a "credibility" determination in SSR 96-7p.[12] Under SSR 16-3p, an ALJ undertakes a two-step process to assess the limiting effects of a claimant's symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304. At step one, "the ALJ will ask whether … there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers*, 486 F.3d at 247 (citing 20 C.F.R. § 416.929(a)); SSR 16-3p, 2017 WL 5180304, at *3. At step two, "if … such an impairment exists," the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," an ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304,

---

12 In relevant parts, SSR 16-3p removed the word "credibility" from its predecessor and refocused the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2 (SSA Oct. 25, 2017). Despite these changes, the procedures for reviewing an ALJ's assessment under SSR 16-3p are substantially the same as the procedures under SSR 96-7p. *See Delong v. Comm'r of Soc. Sec.*, No. 2:18-cv-368, 2019 WL 409364, *7–8 (S.D. Ohio, Feb. 1, 2019). Courts agree that the prior case law involving SSR 96-7p generally applies to the renamed "consistency determination" under SSR 16-3p. *Whicker-Smith v. Comm'r of Soc. Sec.*, No. 1:18-cv-52, 2019 WL 911084, at *5 (S.D. Ohio, Feb. 25, 2019), *report and recommendation adopted*, 2019 WL 1202361 (S.D. Ohio Mar. 14, 2019).

at *4; 20 C.F.R. § 404.1529(c)(4). Aside from medical evidence, SSR 16-3p requires the ALJ to consider: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve symptoms; any measures used to relieve symptoms; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(3). To be sure, "[t]he ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

The ALJ properly followed SSR 16-3p in evaluating Duck's subjective symptom complaints. At step one, the ALJ found that Duck had "impairments that [could] be reasonably expected to cause the alleged symptoms." Tr. 28. Moving to step two, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 28. Although Duck claims that the ALJ relied "[e]ntirely on" Duck's pre-disability work history, Doc. 8, at 13–14, he overlooks the ALJ's thorough discussion of all other supporting evidence in the record, *see* Tr. 22–28. The ALJ reviewed Duck's function report and found that Duck could "dress himself, bathe, care for his hair, shave, feed himself, and use the toilet without much

difficulty," even though he would need "reminders to take care of his personal needs." Tr. 23; *see* 20 C.F.R. § 404.1529(c)(3)(i) (requiring ALJs to consider the claimant's daily activities in evaluating subjective symptoms).

Moreover, the ALJ did not simply consider "minor, life-sustaining activities" to evaluate the intensity, persistence, and limiting effects of Duck's symptoms. *Lawrence v. Comm'r of Soc. Sec.*, 1:21-cv-1691, 2023 WL 2246705, at *13 (N.D. Ohio Jan. 19, 2023). He considered "[t]he location, duration, frequency, and intensity" of Duck's symptoms, 20 C.F.R. § 404.1529(c)(3)(ii), noting that Duck claimed having visual and auditory hallucinations and feeling "anxious leaving the house." Tr. 25. With regard to "[p]recipitating and aggravating factors," 20 C.F.R. § 404.1529(c)(3)(iii), the ALJ noted that Duck reported a greater stress level when he tried to work or "just hav[e] a job in general," Tr. 25. The ALJ discussed Duck's treatment history, including prescribed medications regimen, Tr. 25–26, medication side effects, Tr. 26, and therapy sessions with Meyers, Tr. 27. *See* 20 C.F.R. § 404.1529(c)(3)(iv)–(v) (instructing ALJs to consider types of medications and treatments used to alleviate a claimant's symptoms). In sum, substantial evidence supports the ALJ's evaluation of Duck's subjective symptoms, and the ALJ gave a sufficient explanation to make clear the weight he gave to relevant evidence and the reasons for that weight. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *10.

Nor did the ALJ err in considering Duck's pre-disability work history as part of his subjective symptom evaluation. SSR 16-3 makes clear that as part

of the second-step analysis, ALJs "will consider all of the available evidence," 20 C.F.R. § 404.1529(a), including, among other things, "information about [a claimant's] prior work record," 20 C.F.R. § 404.1529(c)(3). Indeed, "[b]oth before and after SSR 16-3p, work history has been a valid consideration in the ALJ's analysis of subjective complaints." *Gilliam v. Comm'r of Soc. Sec.*, No. 2:18-cv-12793, 2019 WL 6112696, at *11 (E.D. Mich. July 10, 2019), *report and recommendation adopted*, 2019 WL 4051746 (E.D. Mich. Aug. 28, 2019); *see also Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (concluding that an ALJ did not err in discounting the claimant's subjective pain testimony because he gave inconsistent explanations for leaving his job).

Next, Duck claims that the RFC "failed to properly account for … Duck's limitations in concentration, persistence, and pace." Doc. 8, at 14. But as the Social Security Administration has explained, "the limitations identified in the paragraph B and paragraph C criteria [as part of the step-three analysis] are not an RFC assessment." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). Accordingly, paragraph B findings need not correspond with the RFC findings. *Bice v. Comm'r of the Soc. Sec. Admin.*, No. 5:25-cv-01849, 2026 WL 2164447, at *9 (N.D. Ohio July 28, 2026); *see McDowell v. Comm'r of Soc. Sec.*, No. 1:20-cv-297, 2021 WL 1911459, at *9 (N.D. Ohio Apr. 19, 2021) ("That the ALJ found Claimant had mild limitations in regards to the functional areas does not mandate inclusion of limitations in the RFC."), *report and recommendation adopted*, 2021 WL 1909789 (N.D. Ohio May 12, 2021). Courts have thus held

that a finding of moderate limitations in maintaining concentration, persistence, and pace "does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." *Vigil v. Colvin*, 805 F.3d 1199, 1203 (10th Cir. 2015); *see Cody v. Comm'r of Soc. Sec.*, No. 1:13-cv-344, 2013 WL 6074130, at *16 (N.D. Ohio Sept. 24, 2013) (explaining that a consultative examiner's "findings of moderate limitations in Paragraph B criteria does not mean she was required to make corresponding findings" for the RFC assessment), *report and recommendation adopted*, 2013 WL 6065757 (N.D. Ohio Nov. 18, 2013).

In any event, however, the ALJ's RFC sufficiently accommodates the moderate limitations in concentrating, persisting, and maintaining pace found in step three. The RFC provides that Duck could "understand, remember, and carry out simple instructions for work not requiring a specific production rate … nor work requiring hourly quotas." Tr. 25. It adds that Duck was "[c]apable of using judg[]ment to make simple work[-]related decisions, with infrequent changes explained in advance" and could tolerate "occasional interaction with the general public." Tr. 25. These functional limitations, which " limit[] [Duck] to only 'simple' instructions and tasks and … to only occasional interaction with other people are … designed to address [his] moderate deficiencies in concentration, persistence, pace, and adaptation." *Tackett v. Bisignano*, No. 6:25-cv-40, 2025 WL 2984313, at *5 (E.D. Ky. Oct. 22, 2025); *see also Bice*, 2026 WL 2164447, at *9 (holding that limiting a claimant to routine work at non-

production-rate pace sufficiently accommodated her moderate limitation in maintaining concentration, persistence, and pace). The ALJ thus did not err in formulating the RFC.

Finally, as a related matter, Duck claims that the ALJ failed to include all of his mental limitations in the hypothetical questions posed to Salkin, who testified as a qualified vocational expert at the administrative hearing. *See* Doc. 8, at 16–17. To be sure, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). That said, "[i]n fashioning the hypothetical question to be posed to the vocational expert, the ALJ 'is required to incorporate only those limitations accepted as credible by the finder of fact.'" *Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003) (quoting *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993)). Here, the hypotheticals tracked the language of the RFC, which is supported by substantial evidence. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 435 (6th Cir. 2018) (holding that, in a case where the hypothetical question "tracked" the ALJ's RFC findings, a challenge to the ALJ's hypothetical question is duplicative of a challenge to the RFC findings). Because the ALJ's RFC and corresponding hypotheticals to Salkin were supported by substantial evidence, the ALJ did not err.

**Conclusion**

For all the reasons stated, I affirm the Commissioner's decision.

Dated: November 9, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge